UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SHAWN MCCAIGUE
and KATHLEEN MCCAIGUE,

    Plaintiffs,

                                        Case No. 23-cv-1225-pp

    v.

BRANDON EDWARDS, CARRIE PETERS,
CITY OF APPLETON, MD JOJO HAMMOND,
RN ROBIN YOUNG, MD BABABO OPANEYE,
MD DAVID SICKELS, MD THOMAS ROWELL,
INFINITY HEALTHCARE PHYSICIANS SC,
ASCENSION NE WISCONSIN, INC.,
ASCENSION MEDICAL GROUP-FOX VALLEY WISCONSIN, INC.
and JOHN/JANE DOE,

    Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART APPLETON DEFENDANTS' MOTION TO DISMISS (DKT. NO. 5), GRANTING INFINITY DEFENDANTS' MOTION TO DISMISS (DKT. NO. 29) AND GRANTING ASCENSION DEFENDANTS' MOTION TO DISMISS (DKT. NO. 31)

Plaintiff Shawn McCaigue—representing himself—filed a complaint on September 18, 2023, listing as plaintiffs himself and his mother, Kathleen McCaigue. Dkt. No. 1 at ¶¶4, 5. The complaint brings claims against the City of Appleton and City of Appleton Police Officers Brandon Edwards and Carrie Peters (the "Appleton defendants"); Infinity Healthcare Physicians, S.C. and Dr. Jojo Densel Hammond, M.D. (the "Infinity defendants"); Dr. David Sickels, M.D.; and Ascension NE Wisconsin, Inc., Ascension Medical Group—Fox Valley Wisconsin, Inc., Robin Young, R.N., Dr. Bababo Opaneye, M.D. and Dr.

1

Thomas Rowell, M.D.[1] (the "Ascension defendants"). Id. at ¶¶6–16. It raises claims under 42 U.S.C. §1983 relating to the defendants' alleged violations of the plaintiffs' constitutional rights following a March 14, 2020 car accident. Id. at ¶¶1, 21.

The Appleton defendants have moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), arguing that the plaintiffs' claims are time-barred. Dkt. Nos. 5. The Ascension defendants answered the complaint, dkt. no. 9, then moved to dismiss it under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for lack of subject-matter jurisdiction and for failure to state a claim, dkt. no. 31. The Infinity defendants answered the complaint, dkt. no. 25, then moved to dismiss it for lack of subject-matter jurisdiction and failure to state a claim, dkt. no. 29.

The court will grant the motions filed by the Ascension defendants and the Infinity defendants and will grant in part and deny in part the Appleton defendants' motion to dismiss.

## I. Facts

At the motion to dismiss stage, the court must accept the allegations of the complaint as true. Covington v. Chasteen, Case No. 24-1429, 2025 WL 879905, at *2 (7th Cir. 2025). Accordingly, the court has taken the following facts from the complaint.

On March 14, 2020, Shawn McCaigue and Kathleen McCaigue were in a severe car accident when they rear-ended another vehicle, causing them both to suffer traumatic brain injuries and amnesia. Dkt. No. 1 at ¶21. Following the accident, Appleton Police Officer Brandon Edwards arrived on the scene, and

---

[1] Though the plaintiff named Thomas Rowell, M.D. in the caption of the complaint, the body of the complaint contains no allegations against Rowell.

2

the plaintiffs allege that he opened Shawn McCaigue's car door, pushed down on Shawn McCaigue's head, grabbed him by the coat, punched him twice in the head, then called an ambulance for "excited delirium," instead of a traumatic brain injury. Id. at ¶¶23–28. Shawn McCaigue "does not know what happened because of his amnesia." Id. at ¶26.

After arriving at the hospital, Appleton Police Officer Carrie Peters allegedly told Dr. Jojo Hammond, M.D. and Nurse Robin Young, R.N. to misdiagnose the plaintiffs—specifically, to treat them as if they hadn't suffered traumatic brain injuries in the car accident—to deprive the plaintiffs of proper medical care. Id. at ¶¶30–32. Peters allegedly falsified the car accident report, stating that neither plaintiff had suffered a head injury from the collision. Id. at ¶31. The plaintiffs allege that as a result of this false information and Peters's directions, Dr. Hammond refused to treat Shawn McCaigue's traumatic brain injury. Id. at ¶¶33–34. The complaint alleges that "Dr. Hammond did not properly examine [the plaintiff]." Id. at ¶34. It alleges that Hammond "ask[ed] [Shawn McCaigue] to bend his knee and . . . looked in [Shawn McCaigue's] eyes"; it alleges that Hammond "did not call in a neuropsychologist or neurologist" and that he did not "do any neurological, neuropsychological or concussion testing." Id.

The complaint alleges that Hammond, along with Dr. Opaneye and Nurse Young, falsified Shawn McCaigue's medical record so that Shawn McCaigue would be put in the "psych unit" instead of the "trauma unit," where he belonged. Id. at ¶35. It alleges that once in the "psych unit," Shawn McCaigue was abused by hospital staff, who repeatedly slammed him down, causing further injury to his brain. Id. at ¶36. The complaint asserts that hospital staff

3

abused Shawn McCaigue "because . . . Peters told the hospital to misdiagnose Shawn [McCaigue] with no head injury." Id.

The complaint alleges that Kathleen McCaigue also had a traumatic brain injury but that she wasn't examined because of Peters's directions to Hammond. Id. at ¶37. It asserts that, as a result, Kathleen McCaigue did not know she had suffered a traumatic brain injury when she had. Id. The complaint alleges that on March 17, 2020—several days after the accident— Ascension Hospital staff called Kathleen McCaigue to tell her that her son Shawn McCaigue was not doing well in the psych unit, and that Kathleen McCaigue went to visit him. Id. at ¶38. It asserts that when Katheen McCaigue arrived at the hospital, Nurse Mike Aderman (who is not named as a defendant) "chopped Kathy [McCaigue] to the floor," causing her "to injure her arm and the back of her knee" on March 17, 2020," as well as to injure "the neurons in her brains." Id.

The complaint alleges that "Shawn [McCaigue] was then put in Chapter 51 illegally because of the conspiracy against him," allegedly resulting in Shawn McCaigue having "his second amendment rights illegally taken from him." Id. at ¶¶39–40. It alleges that Shawn McCaigue had "many of his civil rights abused because of the actions of the defendants," although it does not identify these other rights. Id. at ¶41. The complaint alleges that Kathleen McCaigue "suffered severe cognitive problems because she was denied medical care and chopped to the floor." Id. at ¶42. It asserts that "[s]he also suffered severe emotional damage because her son was charged with a felony because of the conspiracy against him," which stress caused her "severe cognitive problems." Id.

4

The complaint raises six claims for relief: (1) that Officer Edwards used excessive force against Shawn McCaigue in violation of his Fourth Amendment rights; (2) that Edwards denied Shawn McCaigue medical care; (3) that Officer Peters denied both plaintiffs medical care and interfered with their medical care; (4) that the City of Appleton is required to indemnify Edwards and Peters for any damages stemming from their unconstitutional conduct; (5) that Peters and Ascension Hospital conspired to deprive Shawn McCaigue of his Second Amendment Rights; and (6) that the City of Appleton is liable for the plaintiffs' injuries based on the Appleton Police Department's failure to train its officers and its unconstitutional custom or policy. Id. at 7–11.

The complaint alleges that Edwards's use of excessive force, Edwards's denial of medical care and Peters's denial of medical care "were . . . done under color of state law, within the course and scope of their employment as law enforcement officers." Id. at ¶46. The plaintiffs allege that the defendants "conspired against" them on behalf of Edwards and Peters. Id. It asserts that the "[p]laintiffs were physically, mentally, emotionally, and financially injured and damaged" by the defendants' conduct. Id. at ¶48.

## II.     Kathleen McCaigue

The motions to dismiss filed by both the Ascension defendants and the Infinity defendants point out that Shawn McCaigue is attempting to represent his mother and co-plaintiff, Kathleen McCaigue. Dkt. Nos. 29 at 10–11; 32 at 10–11. The defendants argue that because he is not an attorney, Shawn McCaigue cannot represent his mother and that the court should dismiss Kathleen McCaigue as a plaintiff. Dkt. Nos. 29 at 10; 32 at 10. The defendants emphasize that although the complaint asserts claims on behalf of both plaintiffs, only Shawn McCaigue signed it. Dkt. Nos. 29 at 10; 32 at 10. (The

5

court also observes that only Shawn McCaigue signed the plaintiffs' responses to all three motions to dismiss. Dkt. Nos. 28 at 9; 39 at 9–10; 51 at 10.)

In response to the Ascension defendants' motion to dismiss, Shawn McCaigue asserts that he "is not representing Kathleen" and that "[h]e signed the [complaint] for himself," but that "Kathleen needs the court to appoint someone to protect her interests." Dkt. No. 39 at 6. He explains that "Kathleen is cognitively disabled" and "needs assistance to protect her rights." Id. at 6–7. He quotes Federal Rule of Civil Procedure 17(c) and argues that the court should appoint someone to help Kathleen McCaigue with her claims. Id. at 7.

Federal law does not allow non-lawyers to represent litigants in federal court. Section 1654 of Title 28 states that "parties may plead and conduct their own cases *personally or by counsel*." 28 U.S.C. §1654 (emphasis added); see also Georgakis v. Ill. State Univ., 722 F.3d 1075, 1077 (7th Cir. 2013) ("A nonlawyer can't handle a case on behalf of anyone except himself." (citing 28 U.S.C. §1654)). Federal Rule of Civil Procedure 17(c) allows a legal representative to file a federal lawsuit, or defend one, on behalf of a minor or an incompetent person. The rule also allows a minor or an incompetent person who does not have a legal representative to sue through a court-appointed next friend or guardian *ad litem.* Fed. R. Civ. P. 17(c)(2). Shawn McCaigue has not alleged, or presented evidence, that he has been named Kathleen McCaigue's legal representative. He cannot be her guardian *ad litem*, because he is not a lawyer. See Dietzler v. Moshe & Marcy, Case No. 07-C-744, 2007 WL 2572289, at *1 (E.D. Wis. Sept. 4, 2007) ("While a guardian ad litem must be a lawyer, a next friend can be a lay person."). As a non-lawyer, Shawn McCaigue may represent his mother only if he is appointed as a next friend.

6

But even if the court appointed Shawn McCaigue as a next friend, he still would be required to have a lawyer file a lawsuit on Kathleen McCaigue's behalf, because next friends may not conduct litigation themselves. Elustra v. Mineo, 595 F.3d 699, 704 (7th Cir. 2010) ("[R]epresentative parties such as next friends may not conduct litigation *pro se;* pleadings may be brought before the court only by parties or their attorney." (citing 28 U.S.C. §1654)). Because Shawn McCaigue is not a lawyer, he was not authorized to file claims on behalf of his mother.

Nor is the court able to appoint a lawyer for Kathleen McCaigue. Because Shawn McCaigue is not a lawyer and did not have the authority to file suit on her behalf, Kathleen McCaigue is not a proper plaintiff. If she were, she would need to demonstrate to the court that she had attempted to find counsel on her own (or that her next friend had made such an attempt on her behalf).

In a civil case, the court has the discretion to recruit counsel for individuals unable to afford counsel. Navejar v. Iyola, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); Ray v. Wexford Health Sources, Inc., 706 F.3d 864, 866-67 (7th Cir. 2013). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" Henderson v. Ghosh, 755 F.3d 559, 564 (7th Cir. 2014) (quoting Olson v. Morgan, 750 F.3d 708, 711 (7th Cir. 2014)). In exercising its discretion, the court must consider two things: "(1) 'has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so,' and (2) 'given the difficulty of the case, does the plaintiff appear competent to litigate it [her]self?'" Pennewell v. Parish, 923 F.3d 486, 490 (7th Cir. 2019), (quoting Pruitt v. Mote, 503 F.3d 647, 653

7

(7th Cir. 2007)). To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. Pickett v. Chi. Transit Authority, 930 F.3d 869, 871 (7th Cir. 2019). To do so, the plaintiff must show he contacted at least three lawyers and provide the court with (1) the lawyers' names; (2) their addresses; (3) how and when the plaintiff attempted to contact the lawyer; and (4) the lawyers' responses.

The court has no evidence that Kathleen McCaigue (or Shawn McCaigue, acting on her behalf) attempted to find a lawyer for her. That means that she has not satisfied the first prong of the Pruitt inquiry.

The court must dismiss Kathleen McCaigue as a plaintiff.[2]

## III. The Appleton Defendants' Motion to Dismiss (Dkt. No. 5)

### A.    Legal Standard

The Appleton defendants ask the court to dismiss the complaint under Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) allows a party to assert by motion that the complaint fails to state a claim upon which a federal court can grant relief. "A Rule 12(b)(6) motion tests 'the legal sufficiency of the complaint,' as measured against the standards of Rule 8(a)." Gunn v. Cont'l Cas. Co., 968 F.3d 802, 806 (7th Cir. 2020) (quoting Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind., 786 F.3d 510, 526 (7th Cir. 2015)). A complaint need not include detailed factual allegations, but it must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).

---

[2] Because the court is dismissing Kathleen McCaigue and Shawn McCaigue is the only remaining plaintiff, all references to "the plaintiff" in the remainder of this order are to Shawn McCaigue.

In ruling on a Rule 12(b)(6) motion, the court accepts "all the factual allegations in the complaint as true," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), and draws all reasonable inferences in the plaintiff's favor, <u>Roberts v. City of Chicago</u>, 817 F.3d 561, 564 (7th Cir. 2016).

      B.    <u>Excessive Force Claim</u>

The plaintiff's first claim alleges that Officer Edwards used excessive force on him when Edwards arrived at the scene of the March 14, 2020 accident, by "grabbing [the plaintiff] violently by the coat and punching him violently in the head when [Edwards] knew that [the plaintiff] was in a severe car accident, was extremely confused, had his bell rung and needed a CT scan." Dkt. No. 1 at ¶51. The plaintiff asserts that Edwards's conduct "constituted unreasonable and excessive force and violated [the plaintiff's] right to be free from unreasonable seizures under the Fourth and Fourteenth Amendments to the United States Constitution." <u>Id.</u> at ¶52.

The Appleton defendants argue that the plaintiff's excessive force claim against Edwards accrued on March 14, 2020, when the excessive force was allegedly applied, so his deadline for bringing his excessive force claim was March 14, 2023 (three years after the claim accrued). Dkt. No. 6 at 4. Because the plaintiff filed his complaint on September 18, 2023—over six months after the three-year statute of limitations expired—the defendants argue that his excessive force claim is untimely. <u>Id.</u> at 4–5.

The Appleton defendants anticipate that the plaintiff will argue that his excessive-force claim did not accrue until he *discovered* his related injury and its cause. They argue that this court rejected a similar tolling argument in another §1983 excessive force case, <u>Smith v. Brockway</u>, Case No. 23-C-100, 2023 WL 6607396 (E.D. Wis. Oct. 10, 2023). In <u>Smith</u>, the plaintiff alleged that

9

defendants used excessive force while arresting him, in violation of the Fourth Amendment. Id. at *1. The plaintiff argued that he had suffered "head trauma" and "amnesia" during the arrest and that, as a result, he did not discover his injuries—and thus his claim did not accrue—until he viewed videos of the arrest which were turned over two years after his arrest, during the discovery phase of a separate state-court case. Id. District Judge William C. Griesbach rejected the plaintiff's argument, finding that the plaintiff's specific allegations of severe injury left "no doubt that Plaintiff would have known about Defendants' conduct and the cause of his injury 'immediately' when it happened." Id. at *2.

The Appleton defendants argue that the allegations in the plaintiff's complaint—like those raised by the plaintiff in Smith—clearly demonstrate that the plaintiff would have been aware of the alleged use of force on March 14, 2020, "as Plaintiff[] allege[s] Edwards punched [the plaintiff] in the face at least twice" on that date. Dkt. No. 6 at 6 (citing Dkt. No. 1 at ¶¶27–28). They argue that the plaintiff's related injury accrued on March 14, 2020, meaning that he was required to file his lawsuit by March 14, 2023 to bring suit. Id. at 7.

The plaintiff responds that "[he] had no way to know [of his injuries and their cause] because he had complete amnesia . . . from the [March 14, 2020] car accident." Dkt. No. 28 at 4. He says that until receiving "body camera footage" of the encounter with Edwards, "[t]he only version [he] had [of his encounter with Edwards] is what Edwards wrote in his narrative" and "[he] did not know that Edwards used excessive force against him until he was able to see what really happened in the video." Id. at 4–5. The plaintiff argues that the defendants' reliance on Smith is misplaced. He says that unlike the plaintiff in that case, who could allege from memory "being unnecessarily tackled to the

10

ground," "scream[ing] out in pain" and suffering from "extreme pain at the hospital every time he moved," the plaintiff here asserts that he suffered from "complete amnesia" and had no idea what happened to him until he watched Edwards's body camera footage "sometime after September 18, 2020." Id. at 4–5 (citing Smith, 2023 WL 6607396, at *2).

The argument that a plaintiff filed his complaint after the limitation period expired is an affirmative defense, Fed. R. Civ. P. 8(c)(1), which a defendant may bring as a Rule 12(b)(6) motion to dismiss if the allegations in the complaint set forth everything needed to establish that the claim is untimely, Brooks v. Ross, 578 F.3d 574, 579 (7th Cir. 2009). Dismissal is warranted only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief. Hayes v. City of Chicago, 670 F.3d 810, 813 (7th Cir. 2012) (citing Thomas v. Guardsmark, Inc., 381 F.3d 701, 704 (7th Cir. 2004)).

A plaintiff must bring a §1983 lawsuit within the limitation period for personal injuries mandated by the state in which the claim arose. Huber v. Anderson, 909 F.3d 201, 207 (7th Cir. 2018) (citing Wallace v. Kato, 549 U.S. 384, 387 (2007)). In Wisconsin, the applicable limitation period is three years from the date the injury accrues. Id.; Wis. Stat. §893.53. While federal courts borrow the limitation period from state law, "the accrual date of a §1983 cause of action is a question of federal law that is *not* resolved by reference to state law." Wallace, 549 U.S. at 388. A §1983 claim accrues "when the plaintiff knows or should know that his or her constitutional rights have been violated." Kelly v. City of Chicago, 4 F.3d 509, 511 (7th Cir. 1993) (quoting Wilson v. Giesen, 956 F.2d 738, 740 (7th Cir. 1992)).

An excessive force claim typically accrues at the time the force was applied. Walker v. City of Chicago, 559 F. Supp. 3d 747, 751 (N.D. Ill. 2021); Evans v. Poskon, 603 F.3d 362, 363 (7th Cir. 2010) (observing that Fourth Amendment claims, such as excessive force during, "accrue[] immediately"). Officer Edwards's alleged use of excessive force occurred shortly after he responded to the plaintiff's car accident on March 14, 2020; if the claim accrued on that date, the plaintiff's claim would be untimely. The issue is whether the plaintiff's alleged amnesia tolled the statute of limitations for his claims.

The plaintiff's tolling argument is an iteration of the federal discovery rule which "starts the statute of limitations running only when the plaintiff learns that he's been injured, and by whom." United States v. Norwood, 602 F.3d 830, 837 (7th Cir. 2010). The Seventh Circuit has recognized that where—as here—the plaintiff invokes the discovery rule based on a mental condition, like amnesia or Alzheimer's, "[the] rule . . . permit[s] tolling of the statute of limitations if the condition of which [the plaintiff] complains rendered him incapable of 'discovering' the cause of his injury." Barnhart v. United States, 884 F.2d 295, 299 (7th Cir. 1989).

In Barnhart, the Seventh Circuit considered whether "an adult with no legal guardian" could rely on the discovery rule to toll the limitation period if his mental condition "rendered him incapable of 'discovering' the cause of his injury." Id. at 299. That court concluded that the plaintiff's mental condition did not keep him from discovering his injury and its cause—and, on that basis, did not toll the limitation period—because the plaintiff had filed another, timely suit against a different defendant and his mental condition impaired only his "desire to proceed with the recognized cause of action." Id. at 299–300. The

12

court observed that application of the discovery rule in the mental-incapacitation context should "focus on awareness or ability to comprehend . . . given that the issue under the discovery rule is not capability to bring a lawsuit, but rather capability to *discover* the cause of injury." Id. at 299 (emphasis in original).

Accepting the allegations in the complaint as true and making all reasonable inferences in the light most favorable to the plaintiff, the court must conclude that it is plausible that the plaintiff suffered from amnesia related to the car accident and therefore lacked the awareness necessary to discovery that his Fourth Amendment rights had been violated until he reviewed the body camera footage from the incident. The case cited by the Appleton defendants, Smith, is factually distinguishable. In that case, the plaintiff's complained-of physical injuries could be attributed *only* to the officer's excessive force during his arrest because there was no other event that might have explained the injuries. See Smith, 2023 WL 6607396, at *1–2. In other words, even if that plaintiff had suffered from amnesia, he would have been able to determine that his broken collarbone, broken ribs and severe pain likely stemmed from something that happened when he was taken into custody. Barnhart, 884 F.2d at 299 ("[T]he issue under the discovery rule is not capability to bring a lawsuit, but rather capability to *discover* the cause of injury.") (emphasis in original).

Here, the plaintiff alleges that he was in a severe car accident moments before Edwards pushed down on his head, grabbed his coat and punched him in the face at least twice. Dkt. No. 1 at ¶¶21, 51. It is plausible that in the months following March 14, 2020, the plaintiff assumed that his physical injuries were the result of the car accident and not the result of allegedly

13

unlawful conduct by the defendants. Focusing on the plaintiff's "awareness [and] ability to comprehend" his injuries in the wake of the alleged car accident and the plaintiff's alleged amnesia, the court concludes that the plaintiff's excessive-force claim against Edwards accrued when he received the body-camera video of the March 14, 2020 incidents—which was, at the earliest, on September 18, 2020.

The Appleton defendants' reply brief points out that the plaintiff does not "indicate the date on which [he] learned of [his] injuries," arguing that it appears that the plaintiff "simply subtracted three years from the filing date of [his] Complaint and claim[s] that [he] had no knowledge of [his] injuries until after that date." Dkt. No. 34 at 3. The plaintiff's claim that he learned of his injury "sometime after September 18, 2020" is convenient, given that that is exactly three years before he filed his complaint on September 18, 2023. But when considering a motion to dismiss, the court asks whether the facts alleged in the complaint *could have* happened—not whether they *did* happen. Carlson v. CSX Transp., Inc., 758 F.3d 819, 827 (7th Cir. 2014). And "a plaintiff is not required to negate an affirmative defense, such as a statute of limitations, in his complaint." Clark v. City of Braidwood, 318 F.3d 764, 767 (7th Cir. 2003) (vacating as premature the district court's dismissal of a suit as untimely when the discovery rule could potentially have saved the plaintiff's suit). At the motion to dismiss stage, "the question is only whether there is *any* set of facts that if proven would establish a defense to the statute of limitations." Id. at 768 (citing Early v. Bankers Life & Cas. Co., 959 F.2d 75, 80 (7th Cir. 1992) (emphasis in the original). The plaintiff has alleged facts that, if proven, could justify tolling the three-year limitation period applicable to his excessive force claim. The court will deny the Appleton defendants' motion as to this claim.

C.  Denial of Medical Care and Interference with Medical Care

The plaintiff's second claim, entitled "Denial of Medical Care," alleges that Officer Edwards arrived at the March 14, 2020 accident scene knowing that the plaintiff had been "in a severe car accident, was extremely confused, had his bell rung and needed a CT [computed tomography] scan." Dkt. No. 1 at ¶¶23, 64. The plaintiff alleges that rather than call an ambulance "to assist [the plaintiff] with his severe medical need," Edwards decided to attack the plaintiff. Id. at ¶¶66-67. The plaintiff asserts that Edwards attacked him "with deliberate indifference toward [his] serious medical needs," and that "Edwards had a constitutional duty to ensure that [the plaintiff] received necessary medical attention." Id. at ¶68. The plaintiff's third claim alleges that Officer Peters also knew that the plaintiff was in "a severe car accident" and was "extremely confused." Id. at ¶76. It alleges that at the hospital, Peters told Dr. Hammond that the plaintiff did not have a head injury, causing "Hammond to not treat [him] for his traumatic brain injury." Id. It asserts that Peters's false information also caused the plaintiff to be "put in the psych unit instead of the trauma unit as a result [where he was] slammed down over and over causing him to injure his brain over and over." Id. at ¶77. The plaintiff alleges that Peters's conduct "was done with deliberate indifference toward [his] serious medical needs" and "caused him to "suffer[] compensable damages, including the violation of [his] constitutional rights." Id. at ¶¶79, 83.

The Appleton defendants argue that these claims, like the excessive force claim, are barred by the statute of limitation. Dkt. No. 6 at 7. They contend that claims for denial of medical care or indifference to serious medical need "accrue[] for as long as a defendant officer knows about a serious medical need, has the power to provide treatment, and yet withholds that treatment." Id.

(citing <u>Wilson v. Wexford Health Sources, Inc.</u>, 932 F.3d 513, 517–18 (7th Cir. 2019); <u>Heard v. Sheahan</u>, 253 F.3d 316, 318-20 (7th Cir. 2001)). They point out that the events underlying these claims against Edwards and Peters took place on March 14, 2020, immediately following his car accident. <u>Id.</u> at 7–8. They maintain that the three-year limitation period began to run on March 14, 2020 and expired on March 14, 2023, rendering the claims (brought in the September 18, 2023 complaint) untimely. <u>Id.</u> at 8–9.

The plaintiff again responds that the discovery rule effectively tolls the limitation period for his denial of medical care/deliberate indifference claims. He reiterates his allegation that he "has no memory of the incident because of his amnesia" and says that the claims did not accrue until he saw the body camera footage of Edwards. Dkt. No. 28 at 5. The plaintiff asserts that he "had no way to know or even suspect" that Peters had conspired to deny him proper medical care "until [he] watched the video," which he says "[he] received after September 18[,] 2020." <u>Id.</u>

The Appleton defendants reply that "the discovery rule is simply irrelevant to the accrual of medical care claims." Dkt. No. 34 at 5. They argue that the claims accrued when Edwards and Peters "knew about Plaintiff[']s serious medical need, had the power to provide treatment, and withheld that treatment." <u>Id.</u> They assert that because Peters and Edwards "no longer had the power to provide medical treatment to Plaintiff[]" on March 14, 2020, "the statute of limitations began running at that time, and expired on March 14, 2023." <u>Id.</u>

In <u>Wilson</u>, the Seventh Circuit determined that "[t]he alleged wrong—the refusal to provide medical care—'continued for as long as the defendants had the power to do something about [the plaintiff's] condition.'" 932 F.3d at 517–

16

18 (quoting <u>Heard</u>, 253 F.3d at 318) (alterations in original). In <u>Wilson</u>, the plaintiff's claim accrued when the defendant—a physician who allegedly refused to provide the plaintiff (a prisoner) medical care—resigned from the prison where the plaintiff was housed. <u>Id.</u>

Here, the plaintiff's deliberate indifference claims accrued when Edwards and Peters released the plaintiff into the hands of physicians sometime on March 14, 2020. At that point, Edwards and Peters no longer had the power to do anything about the plaintiff's medical condition. Because the plaintiff's deliberate indifference claims accrued on March 14, 2020, he was required to file those claims by March 14, 2023. He didn't file this case until September 2023—six months later. The court will dismiss the plaintiff's "denial of medical care" claims because they are barred by the statute of limitation.

> D.    <u>Conspiracy to Deprive the Plaintiff of his Second Amendment Rights</u>

The plaintiff's fifth[3] claim alleges that he "had his second amendment rights taken away because of the conspiracy between Officer Peters and Ascension [hospital]." Dkt. No. 1 at p. 11, ¶1.[4] The Appleton defendants respond that this claim, too, is time-barred. Dkt. No. 6 at 9. They also argue that the plaintiff's allegations fail to state a claim for which relief may be granted. <u>Id.</u> They assert that they cannot "ascertain what rights Plaintiff[] believe[s] were deprived under the Second Amendment based on the allegations in the Complaint." <u>Id.</u> They assert that the plaintiff "provide[s] no facts to

---

[3] The plaintiff's fourth claim is an indemnification claim, arguing that the City of Appleton must indemnify its officers for actions taken during the scope of their employment. The court addresses that claim later in this decision.

[4] Although the plaintiff laid out the first ten pages of his complaint in consecutively numbered paragraphs one through ninety, he restarted the numbering with his fifth claim, at the top of page eleven. Dkt. No. 1 at 11, ¶1.

17

reasonably connect the Second Amendment with Peter's [sic] alleged actions on March 14, 2020[,]" and that he does not "point to any regulation, ordinance, or law created by the government that deprived them of their Second Amendment rights." Id. at 10.

The plaintiff clarifies that the defendants' conduct deprived him of his Second Amendment right to bear arms. Dkt. No. 28 at 7. He explains that "Peters t[old] the hospital to falsify [the plaintiff's] diagnosis to say that [he] didn't have a traumatic brain injury," which led to him "being put in Chapter 51 [and to have] his right to bear arms . . . taken away from him by the Outagamie County Circuit Court." Id. The plaintiff states that he "believed the hospital's [false] diagnosis and had no way to preserve his second amendment right as a result." Id. Although he says that "it took [him] a very long time to realize . . . the hospital knew [he had a traumatic brain injury] and lied to [him about it] because Sgt. Peters told them [to]," the plaintiff does not specify when he discovered the alleged conspiracy to deprive him of his right to bear arms. Id. at 8.

It appears that the plaintiff is referring to involuntary commitment proceedings for mental illness under Chapter 51 of the Wisconsin Statutes. A commitment order under Chapter 51 carries collateral consequences, which can include a prohibition on the possession of firearms. See Wis. Stat. §51.20(cv); Matter of D.K., 390 Wis. 2d 50, 66–67 (Wis. 2020). The plaintiff appears to allege that because Peters instructed Ascension hospital staff to not diagnose him with a head injury, he was diagnosed as mentally ill and subjected to commitment proceedings, resulting in the loss of his Second Amendment right to possess firearms.

18

This claim does not state a claim for which this court may grant relief. The plaintiff's allegations against Peters—that Peters told hospital staff not to diagnose him with a traumatic brain injury—are too attenuated from the injury he says he sustained—the loss of his Second Amendment rights due to the Outagamie Circuit Court issuing a Chapter 51 involuntary commitment order. The plaintiff has not alleged that hospital doctors were required to do what Peters allegedly told them to do or that they knowingly agreed to do what Peters allegedly told them to do. He has not alleged that the Outagamie Circuit Court—which apparently issued the involuntary commitment order that resulted in the plaintiff's loss of his Second Amendment rights—violated his procedural or substantive rights, or that it erred in concluding that he should be involuntarily committed. See D.K., 390 Wis. 2d at 67–69 (outlining the procedural safeguards owed to those undergoing civil commitment proceedings). The plaintiff's allegation that "[he] would never have been in chapter 51 except for the conspiracy that lied to . . . [his] doctor that he didn't have a traumatic brain injury," dkt. no. 1 at ¶3, is conclusory and ignores the possibility that a traumatic-brain-injury diagnosis also could have resulted in his being subjected to Chapter 51 proceedings and lawfully prohibited from possessing firearms.

Because the plaintiff's fifth claim fails to state a claim for which this court can grant relief, the court will grant the Appleton defendants' motion to dismiss claim five of the complaint.

E.     Municipal Liability

The plaintiff has brought two claims against the City of Appleton. Claim four asserts that the city is required to indemnify Officers Edwards and Peters for any damages stemming from their violations of the plaintiff's constitutional

19

rights. Dkt. No. 1 at ¶¶85–90. Claim six alleges that the city is liable for (1) the Appleton Police Department's failure to train its officers on how to properly respond to car accidents in which the car occupants have suffered injuries and (2) the existence of an ongoing unconstitutional policy or custom under which Ascension hospital and the Appleton Police Department "cover up" for the other entity's "wrongdoing." Dkt. No. 1 at p. 11, ¶¶6–8.

The Appleton defendants argue that because the plaintiff's substantive constitutional claims (his first, second, third and fifth claims) are time-barred, there is no underlying constitutional violation on which to base an indemnification claim against a municipality. Dkt. No. 6 at 11 (citing <u>Fillmore v. Page</u>, 358 F.3d 496, 506 (7th Cir. 2004); <u>Williams v. Michalsen</u>. Case No. 19-cv-56, 2020 WL 1939136, at *9 (E.D. Wis. Apr. 21, 2020)). But the court has declined to dismiss the first claim, given that the plaintiff has a potentially viable discovery-rule defense to the statute of limitation. The court will not dismiss the plaintiff's indemnification claim as to his first claim.

As for the failure-to-train/unconstitutional-policy-or-custom claim, the Appleton defendants argue that the claim is time-barred by the three-year limitation period. <u>Id.</u> In the alternative, they argue that the claim lacks facial plausibility because it "rest[s] on conclusory assertions without identifying any practice, policy, or custom that resulted in a constitutional violation." <u>Id.</u> at 11–12.

The plaintiff responds that "[n]either Sgt. Peters [n]or Sgt. Edwards . . . realized that [the plaintiff's] behavior was caused by his traumatic brain injury," and that "[t]he officers need to be better trained so this doesn't happen again." Dkt. No. 28 at 8. The plaintiff argues that had Edwards been properly trained, "[he] may have handled the situation differently." <u>Id.</u> The plaintiff

20

contends that "there is some sort of corrupt relationship between the Appleton Police Department and Ascension Hospital where the hospital covers for the police's wrongdoing and the police cover for the hospital's wrongdoing." Id. at 8–9. He argues that the hospital staffs' falsification of his diagnosis at the direction of Peters is evidence of this corrupt relationship. Id. at 9.

Under Monell v. Dep't of Social Services, 436 U.S. 658 (1978), a municipality can incur §1983 liability if a deprivation of constitutional rights "was the result of municipal 'custom or policy.'" City of Oklahoma City v. Tuttle, 471 U.S. 808, 817 (1985). One way to state a §1983 claim against a municipality is to "allege that an official policy or custom not only caused the constitutional violation, but was 'the moving force' behind it." Estate of Sims ex rel. Sims v. County of Bureau, 506 F.3d 509, 514 (7th Cir. 2007) (citing City of Canton v. Harris, 489 U.S. 378, 389 (1989); Arlotta v. Bradley Ctr., 349 F.3d 517, 521–22 (7th Cir. 2003); Gable v. City of Chicago, 296 F.3d 531, 537 (7th Cir. 2002)). On a motion to dismiss, a plaintiff may identify the official policy or custom by alleging "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." Id. (citing Lewis v. City of Chicago, 496 F.3d 645, 656 (7th Cir. 2007)).

Under a failure-to-train theory of municipal liability, "[a] municipality can be held liable . . . if it has actual knowledge of a pattern of criminally reckless conduct and there is an obvious need to provide training to avert harm, even if the prior acts have yet to result in tragedy." Flores v. City of S. Bend, 997 F.3d 725, 733 (7th Cir. 2021) (citing Harris, 489 U.S. at 390 n.10). A failure-to-train

theory of liability fits within the Monell framework because, "by failing to train an employee whose conduct the municipality knows to be deliberately indifferent to the public, the municipality itself demonstrates deliberate indifference to that known risk." Id. at 731. "[F]ailure-to-train liability does not require proof of widespread constitutional violations before that failure becomes actionable; a single violation can suffice where a violation occurs and the plaintiff asserts a recurring, obvious risk." Id.

The plaintiff has not alleged a viable §1983 custom or policy claim against the City of Appleton. The plaintiff has identified only one instance where Peters allegedly directed Ascension hospital staff to "falsely diagnose" the plaintiff. Dkt. No. 1 at p. 11, ¶7. This single incident, even if proven, does not amount to a "widespread practice that is so permanent and well-settled that it constitutes a custom or practice." See Estate of Sims, 506 F.3d at 514.

Nor has the plaintiff stated a claim under the failure-to-train theory of §1983 municipal liability. The plaintiff's failure-to-train theory relates to his excessive-force and failure-to-provide-medical-care claims against Edwards. He alleges that Edwards used excessive force on him because "the Appleton Police Department failed to properly train Edwards on the use of force." Id. at p. 5, ¶25. But the plaintiff has not alleged that Edwards has a history of using excessive force or failing to provide medical care and that the Appleton Police Department was aware of that history. The complaint does not establish either theory of Monell liability.

F.    Summary

In sum: the court will grant the Appleton defendants' motion to dismiss with respect to the plaintiff's "Denial of Medical Care" claims (the second and third claims), his "Conspiracy to deprive 2nd [A]mendment rights" claim (the

22

fifth claim) and his "Municipal Liability" claim (the sixth claim). The court will deny the Appleton defendants' motion to dismiss with respect with to the plaintiff's "Excessive force" claim (the first claim) and indemnification claim (the fourth claim).

## IV. The Infinity Defendants' Motion to Dismiss (Dkt. No. 29) and the Ascension Defendants' Motion to Dismiss (Dkt. No. 31)

### A. The Parties' Arguments

Both the Infinity defendants and the Ascension defendants construed the plaintiff's claims against them as medical malpractice claims under Chapter 655 of the Wisconsin Statutes. Dkt. Nos. 29 at 6–8; 32 at 7, 11. Both argued that in the absence of diversity jurisdiction (which they argue does not exist here), this federal court does not have subject-matter jurisdiction over the plaintiff's state-law claims against private entities. Dkt. Nos. 29 at 3-5; 32 at 5-7.

Both the Infinity and Ascension defendants argue that even if the court has subject-matter jurisdiction, the plaintiff's claims against them are time-barred by the applicable three-year limitation period. Dkt. Nos. 29 at 7–8 (citing Wis. Stat. §893.54(1m); Young v. Aurora Med. Ctr. of Wash. Cnty., Inc., 272 Wis. 2d 300 (Wis. Ct. App. 2004)); 32 at 7 (citing Wis. Stat. §893.55(1m); RWJ Mgmt. Co. v. BP Products N. Am., Inc., 672 F.3d 476, 479-80 (7th Cir. 2012)).

To the extent the plaintiff attempts to bring a §1983 claim against them, the Ascension defendants argue that because they are "private health care providers, [they] were not acting under color of law, and therefore no claim under 42 U.S.C. §1983 had been properly pled." Dkt. No. 32 at 4–5.

Both the Infinity and Ascension defendants argue that the plaintiff has not alleged that he exhausted the mediation procedures required under state

law prior to filing a lawsuit. Dkt. Nos. 29 at 8 (citing Wis. Stat. §655.44); 32 at 11 (citing Wis. Stat. §655.44).

Finally, the Infinity defendants argue that the complaint does not state a claim upon which a federal court may grant relief, dkt. no. 29 at 5-6, and both defendants advise the court that at the time they filed their response briefs, the plaintiff had a nearly identical case already pending in Wisconsin state court, dkts. no. 29 at 8-10; 32 at 8-10. The Ascension defendants asked the court to abstain under the <u>Colorado River</u> abstention doctrine. Dkt. No. 32 at 9-10 (citing <u>Colorado River Water Conservation District v. United States</u>, 424 U.S. 800 (1976)).

The plaintiff's response to both motions is substantially similar. Dkt. Nos. 39, 51. The plaintiff asserts that "[t]his case is not governed by Chapter 655 of the Wisconsin Statutes as these are federal issues where [he] . . . w[as] deprived of [his] constitutional rights." Dkt. No. 39 at 4; <u>see also</u> Dkt. No. 51 at 3 ("This case is not under chapter 655 as these are constitutional issues."). The plaintiff contends that "the moving defendants were acting under the color of state law as they were conspiring against [him] with a police officer who was acting under color of state law." Dkt. Nos. 39 at 1; 51 at 1. He reiterates his allegations from the complaint that the defendants falsified his medical records as a part of a conspiracy with Officer Peters to "deny him treatment for his traumatic brain injury." Dkt. Nos. 39 at 2; 51 at 2. He maintains that "[b]y conspiring with someone who was acting under color of state law, the moving defendants are also deemed to be acting under color of state law." Dkt. Nos. 39 at 2; 51 at 2 (quoting <u>Dennis v. Sparks</u>, 449 U.S. 24 (1980); <u>Bendiburg v. Dempsey</u>, 909 F.2d 463 (11th Cir. 1990)).

In their respective reply briefs, the Ascension and Infinity defendants argue that the plaintiff failed to allege §1983 liability against them under a conspiracy theory. The Infinity defendants contend that "all that the Plaintiff[] established is what Sgt. Carrie Peters unilaterally told [defendant Hammond] to do[]"—namely, Peters "told" Dr. Hammond to "misdiagnose [the plaintiff] with no head injury[,]" and Peters "caused" Hammond to "falsify [the plaintiff's] medical records." Dkt. No. 44 at 7 (citing Dkt. No. 1 at ¶19). The Infinity defendants argue that these allegations do not establish that Hammond was "a willful participant in [any] joint activity with the State or its agents." Id. at 8 (citing Reynolds, 488 F.3d at 764). The Ascension defendants similarly assert that although the plaintiff alleges that "Peters '*told*' Dr. Hammond and Nurse Young to misdiagnose him with no head injury" and "'caused' Dr. Hammond and Nurse Young to falsify [the plaintiff's] medical records so they could put [him] in the 'psych unit instead of the trauma unit[,]'" dkt. no. 49 at 2-3 (citing Dkt. No. 1 at ¶19), those allegations "do not establish that the parties reached an understanding or were willful participants," id. at 4. "[The plaintiff's] alleged conspiracy is not a conspiracy, as it is based on what the police allegedly told a private health care provider to do." Id.

     B.    <u>Subject-Matter Jurisdiction and §1983 Liability</u>

Federal courts are courts of limited jurisdiction; they may hear and decide a case only if that case involves specific "subject matter." Federal courts have the authority to consider and decide lawsuits between citizens of different states, if the amount in controversy is more than $75,000—this is called "diversity jurisdiction." 28 U.S.C. § 1332. They also have the authority to consider and decide cases that involve violations of federal laws or the federal constitution—this is called "federal question" jurisdiction. 28 U.S.C. § 1331.

25

But "[n]o court may decide a case without subject matter jurisdiction, and neither the parties nor their lawyers may stipulate to jurisdiction or waive arguments that the court lacks jurisdiction." United States v. Tittjung, 235 F.3d 330, 335 (7th Cir. 2000) (multiple citations omitted). Federal courts must satisfy themselves that they have jurisdiction and if the parties don't raise the issue, "a court must raise the jurisdictional question on its own." Id. Without either diversity or a federal question, a federal court does not have original jurisdiction.

Federal courts cannot consider and decide lawsuits alleging violations of *state* law unless the plaintiff lives in a different state from every defendant (and the amount of claimed damages exceeds $75,000), or unless the state-law claims relate to a federal claim. The court has an independent obligation to determine whether the parties are "diverse." Thomas v. Guardsmark, LLC, 487 F.3d 531, 533 (7th Cir. 2007). For the court to have diversity jurisdiction, "the plaintiff must differ in citizenship from each defendant—the rule of 'complete diversity'—in order for subject matter jurisdiction to exist under § 1332." Eichmann v. Hunter Automated Machinery, Inc., 167 F. Supp. 2d 1070, 1071-72 (E.D. Wis. 2001) (citing Vandervest v. Wis. Central, Ltd., 936 F. Supp. 601, 603 (E.D. Wis. 1996); Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806); and Bagdon v. Bridgestone/Firestone, Inc., 916 F.2d 379, 381 (7th Cir. 1990), cert. den., 500 U.S. 952 (1991)). "Complete diversity means diversity "between all named plaintiffs and all named defendants, and no defendant is a citizen of the forum state." Lincoln Property Co. v. Roche, 546 U.S. 81, 84 (2005).

The complaint alleges that Shawn McCaigue is a citizen of Wisconsin. Dkt. No. 1 at 1 and ¶4. It alleges that the Infinity and Ascension defendants all are residents of Wisconsin. Id. at ¶¶9-16 (pages 2-3). Because the plaintiff and

26

all the Infinity and Ascension defendants are citizens of the same state, the court does not have diversity jurisdiction over the Infinity and Ascension defendants, or the plaintiff's claims against them.

Section 1331 of Title 28 states that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." This is called "federal question" jurisdiction. For the court to have federal question jurisdiction, a federal question must be evidenced on the face of the complaint. City of Beloit v. Local 643 of Am. Fed'n of State, Cnty. and Mun. Employees, AFL-CIO, 248 F.3d 650, 652 (7th Cir. 2001). "For a case to satisfy § 1331 by 'arising under' federal law, however, it is not enough for a plaintiff to merely call upon a constitutional provision, a federal statute, or a principle of federal common law in the complaint." East Central Ill. Pip Trades Health and Welfare Fund v. Prather Plumbing & Heating, Inc., 3 F.4th 954, 958 (7th Cir. 2021) (citations omitted). The most common way a case "arises under" federal law is when "federal law creates the cause of action asserted." Id. (quoting Gunn v. Minton, 568 U.S. 251, 257 (2013)).

In response to the Infinity defendants' motion to dismiss, the plaintiff asserted:

> This case is not about medically negligent treatment. It is about an intentional conspiracy to batter [the plaintiff] when they knew that [the plaintiff] had evidence of a traumatic brain injury and deprive [the plaintiff] and Kathy of medical care in violation of their constitutional rights between the Appleton Police Department and Ascension NE Wisconsin-St. Elizabeth Campus. Sgt. Carrie Peters told Dr. Hammond and Nurse Young that this clearly isn't a head injury. The moving defendants conspired against [the plaintiff] to make it look like he did not have a head injury. Dr. Hammond Nurse Young and Dr. Opaneye even went so far as to falsify [the plaintiff's] medical record to take away evidence that [the plaintiff] had a head injury and cause [the plaintiff] to be beaten.

Dr. Hammond wrote in [the plaintiff's] medical record that [the plaintiff] was oriented x3 when he knew that he was not. Nurse Young wrote that [the plaintiff] had a GCS of 15 and was not in an altered mental state when she wrote that [the plaintiff] had a GSC of 14(confused) and it was obvious that [the plaintiff] was in an altered mental state. Dr. Opaneye wrote that [the plaintiff] had a longstanding history of chronic mental illness and poor treatment compliance. This is a complete lie. The moving defendants conspired against [the plaintiff] to deny him treatment for his traumatic brain injury in violation of [the plaintiff's] constitutional rights. They conspired against [the plaintiff] because Sgt. Carrie Peters who was acting under color of state law told them to. [The plaintiff] was slammed down over and over as a result of the conspiracy between Sgt. Peters and Ascension NE Wisconsin-St. Elizabeth Campus.

By conspiring with someone who was acting under color of state law, the moving defendants are also deemed to be acting under color of state law.

Dkt. No. 51 at 1-2. The plaintiff then cites Dennis v. Sparks, 449 U.S. 24 (1980) and Bendiburg v. Dempsey, 909 F.2d 463 (11th Cir. 1990), cases discussing the Supreme Court's decision in Adickes v. S.H. Kress & Co., 389 U.S. 144 (1970), which held that the actions of a private party could be attributable to the state when the private party acted in concert with state actors. Id. at 3.

So—the Infinity and Ascension defendants believe that the plaintiff has asserted state-law malpractice claims against them. The plaintiff responds that he has asserted federal constitutional claims against them. If the defendants are correct, the court has no subject-matter jurisdiction over the Infinity and Ascension defendants. If the plaintiff is right, the court has federal question jurisdiction over those defendants. The court must determine which assertion is supported by the complaint.

Under Wisconsin law, "'[m]edical malpractice' claims are simply claims of "'negligent medical acts or decisions made in the courts of rendering professional medical care.'"" Soderlin v. Doehling, Case No. 18-cv-899, 2021

28

WL 4742716, at *2 (W.D. Wis. Oct. 12, 2021) (quoting Killian v. Nicholson, Case No. 17-C-895, 2018 WL 1902587, at *3 (E.D. Wis. Apr. 20, 2018)). To state a claim for medical malpractice, a plaintiff must allege "(1) a breach of (2) a duty owed (3) that results in (4) harm to the plaintiff." Id. (quoting Carter v. Griggs, Case No. 16-CV-252, 2018 WL 1902885, at *6 (W.D. Wis. Apr. 20, 2018)). The complaint accuses the Infinity and Ascension defendants of putting false information in the plaintiff's medical records, putting him in the wrong treatment unit and abusing him; that sounds as if the plaintiff may be accusing the Infinity and Ascension defendants of breaching duties they owed the plaintiff, resulting in harm to him.

But the plaintiff has *not* alleged that the Infinity and Ascension defendants were "negligent." He has alleged that they *deliberately* put false information in his medical records because Peters told them to, deliberately put him in the wrong unit and deliberately physically abused him. And at least one of the plaintiff's claims—his fifth claim—alleges a "conspiracy" between Peters and "Ascension NE Wisconsin-St. Elizabeth Campus" to lie about the plaintiff's injury and cause him to be subjected to Chapter 51 proceedings, which he alleges caused him to be deprived of his Second Amendment rights. Though it is a close call, the court determines that it does have federal question subject-matter jurisdiction over the Infinity and Ascension defendants, and over the plaintiff's claims against them.

That leads to the defendants' assertions that they are not "state actors." Section 1983 of Title 42 allows a person to sue for deprivation of his constitutional rights a person who caused that deprivation "under color" of state law. "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue

29

of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). Neither the Infinity nor the Ascension defendants meet that definition. Infinity Healthcare Physicians, S.C. is a private service corporation. https://apps.dfi.wi.gov/apps/corpSearch/Details.aspx?entityID=I017704&hash=1258213739&searchFunctionID=37c930 18-1308-42f5-ab35-b9f7d4b594cd&type=Simple&q=infinity+healthcare +physicians%2c+s.c. Ascension NE Wisconsin, Inc. is a private non-stock corporation, https://apps.dfi.wi.gov/apps/corpSearch/Details.aspx?entityID =6S18454&hash=1095843010&searchFunctionID=128cac0e-a0a1-46db-8e82- 468e276a95cd&type=Simple&q=ascension+wisconsin+ne%2c+inc, as is Ascension Medical Group—Fox Valley Wisconsin, Inc., https://apps.dfi.wi.gov/ apps/corpSearch/Details.aspx?entityID=N026526&hash=1319130722&search FunctionID=bcb7c87f-acac-4016-9b39-37e1737e267e&type=Simple&q= ascension+medical+group--fox+valley.

The plaintiff is correct, however, that in some cases, a private party may be treated as if it were a state actor for purposes of §1983. "When a plaintiff brings a section 1983 claim against a defendant who is not a government official or employee, the plaintiff must show that the private entity acted under the color of state law." Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 822 (7th Cir. 2009). This requires a "close nexus between the State and the challenged action," such that "the challenged action 'may be fairly treated as that of the State itself.'" Id. at 823 (citing Jackson v. Metro. Edison Co., 419 U.S. 345, 349-51 (1974)). "[O]n some occasions, the acts of a private party are fairly attributable to the state because the party has acted in concert with state actors." Id. (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 170 (1970)).

The plaintiff alleges that defendants Hammond, Young, Opaneye, Ascension Hospital and Infinity are liable under §1983 because those private medical providers conspired with Peters to violate his constitutional rights. Dkt. Nos. 29 at 1–3; 51 at 1–3. "To establish §1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights; and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents." Reynolds v. Jamison, 488 F.3d 756, 764 (7th Cir. 2007) (quoting Williams v. Seniff, 342 F.3d 774, 785 (7th Cir. 2003)). "[A] bare allegation of a conspiracy between private and state entities is insufficient to bring the private entity within the scope of § 1983." Xiong v. Fisher, 787 F.3d 389, 398 (7th Cir. 2015) (quoting Messman v. Helmke, 133 F.3d 1042, 1045 (7th Cir. 1998)). "'[A] complaint must contain factual allegations suggesting that the defendants reached a meeting of the minds' with respect to violating the plaintiff's constitutional rights." Cox v. Med. Coll. of. Wis., Inc., 651 F. Supp. 3d 965, 997 (E.D. Wis. 2023) (quoting Mirbeau of Geneva Lake, LLC v. City of Lake Geneva, 746 F. Supp. 2d 1000, 1008 (E.D. Wis. 2010)).

The complaint fails to allege that defendants Hammond, Opaneye, Young, and their alleged employers, Ascension hospital and Infinity Healthcare Physicians, S.C., "were willful participants in joint activity with the State or its agents." Reynolds, 488 F.3d at 756 (citation and alterations omitted). The court already has concluded that the plaintiff's claim that there was a conspiracy between Peters and others to deprive him of his Second Amendment rights fails to state a claim. The plaintiff's allegations that he "was put in Chapter 51 illegally because of the conspiracy against him," dkt. no. 1 at ¶39, and that he

31

"had his second amendment rights illegally taken away from him because of the conspiracy," id. at ¶40, are too attenuated, bare and conclusory to establish §1983 liability.

Nor do the plaintiff's specific factual allegations about what went on between Peters and the various medical defendants establish a conspiracy. The plaintiff repeatedly alleges that "Sgt. Peters *told* . . . Hammond and . . . Young to misdiagnose [the plaintiff] with no head injury." Dkt. No. 1 at ¶¶19, 30, 36. The plaintiff alleges that "*Peters caused* Dr. Hammond and Nurse Young to falsify [the plaintiff's] medical records so they could put [him] in the psych unit instead of the trauma unit," id. at ¶19 (emphasis added), and that "Dr. Hammond . . . refused to treat [him] for his traumatic brain injury because Sgt. Peters *told* [Hammond] to diagnose [the plaintiff] with no head injury," id. at ¶33 (emphasis added). The complaint states that the Infinity defendants and Ascension defendants mistreated the plaintiff, not because they had reached a meeting of the minds with Peters about doing so, but because Peters *directed* them to. The complaint does not allege that the private entities were willful participants or that there was a meeting of the minds between Peters and the private entities with respect to violating the plaintiff's constitutional rights. The complaint fails to state a §1983 claim against the Infinity defendants or the Ascension defendants.

Because the plaintiff stresses that the only claims he raises in this lawsuit are constitutional claims for alleged violations of his civil rights under 42 U.S.C. §1983, and because the complaint does not state a claim for §1983 conspiracy between Peters and the Infinity and Ascension defendants, the court need not address the defendants' arguments regarding whether the plaintiff's claims against them are time-barred or whether the defendant

32

complied with Wisconsin law before bringing the claims. The court will grant the Infinity defendants' and the Ascension defendants' motions to dismiss.

## V. David Sickels

The complaint alleges that David Sickels, M.D. worked as a doctor in the emergency room at Ascension NE Wisconsin-St. Elizabeth Campus. Dkt. No. 1 at ¶12. The Ascension defendants who answered the complaint were Nurse Young, Dr. Openeye and Dr. Rowell, as well as the corporate defendants. Dkt. No. 9. Their answer denied that Sickels was employed by Ascension NE Wisconsin St. Elizabeth Campus. Id. at ¶12. The Infinity defendants who answered the complaint were Dr. Hammond and the corporate defendant. Dkt. No. 25. They, too, denied that Sickels was employed by Ascension NE Wisconsin St. Elizabeth, though they admitted that he did work as an emergency medicine doctor at the St. Elizabeth campus. Id. at ¶12. That means that Sickels has not answered the complaint.

The Rule 26(f) Report (filed February 28, 2024) states that although the same law firm that represents the Infinity defendants represents Sickels, Sickels "has not been served to date and the time limit for service has expired. Dr. Sickels does not waive or forfeit any argument as to expiration of the time limit if Dr. Sickels is ever served." Dkt. No. 46 at 6 n.1. Under Fed. R. Civ. P. 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." And "*[s]ua sponte* 12(b)(6) dismissals are permitted, provided that a sufficient basis for the court's action is evident from the plaintiff's pleading." Ledford v. Sullivan, 105 F.3d 354, 356 (7th Cir. 1997) (citing Apostol v. Landau, 957 F.2d 339, 343 (7th Cir.1992)).

33

The plaintiff has provided no proof that he served Sickels within ninety days of the date on which he filed the complaint (September 18, 2023) and the plaintiff has not asked the court to extend the service deadline. As of at least February 28, 2024 (the day the parties signed the Rule 26(f) report), the plaintiff had notice that Sickels had not been properly served, but the court has no evidence that he attempted to effect proper service. Fed. R. Civ. P. 4(m) says that if a plaintiff shows good cause for failing to timely serve a defendant, the court must extend the time for service "for an appropriate period." But even if the plaintiff were to show good cause for his failure to timely serve Sickels, and even if the court were to give the plaintiff additional time to serve him, the court is dismissing the claims against the Ascension defendants for failure to state a claim. The complaint contains no specific allegations against Sickels aside from the general allegations against all defendants. The complaint fails to state a claim against Sickels for the same reasons it fails to state a claim against the rest of the medical defendants. The court will dismiss Sickels as a defendant.

## VI. Conclusion

The court **FINDS** that as a non-lawyer, plaintiff Shawn McCaigue improperly has attempted to raise claims on behalf of Kathleen McCaigue and that Kathleen McCaigue's claims are not properly before this court. The court **DISMISSES** Kathleen McCaigue as a plaintiff.

The court **GRANTS IN PART** and **DENIES IN PART** the Appleton defendants' motion to dismiss. Dkt. No. 5. The court **ORDERS** that the plaintiff's second, third, fifth and sixth causes of action are **DISMISSED WITHOUT PREJUDICE**.

34

The court **GRANTS** the Infinity defendants' motion to dismiss. Dkt. No. 29. The court **ORDERS** that defendants Jojo Hammond and Infinity Healthcare Physicians SC are **DISMISSED WITHOUT PREJUDICE**.

The court **GRANTS** the Ascension defendants' motion to dismiss. Dkt. No. 31. The court **ORDERS** that defendants Robin Young, Bababo Opaneye, Thomas Rowell, Ascension NE Wisconsin Inc and Ascension Medical Group—Fox Valley Wisconsin Inc. are **DISMISSED WITHOUT PREJUDICE**.

The court **ORDERS** that defendant David Sickels is **DISMISSED WITHOUT PREJUDICE**.

The court will issue a separate order setting dates for a scheduling conference and for the remaining parties to submit a revised Rule 26(f) report.

Dated in Milwaukee, Wisconsin this 31st day of March, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

35